**PATE v. HOWE.**
Civ. No. 749.

United States District Court
D. Maine, S. D.
March 3, 1952.

Hyman Jacobson, Portland, Maine, Arthur E. Nissen, Damariscotta, Maine, for plaintiff.

Arthur F. Tiffin, Augusta, Maine, William H. Niehoff, Waterville, Maine, for defendant.

CLIFFORD, District Judge.

This case was tried before a jury which returned a verdict for the plaintiff in the sum of $6,792. The defendant now comes before this Court upon his motion to set aside the verdict and grant a new trial on the grounds that the verdict was against the law and the Charge of the Judge, and manifestly against the weight of the evidence. The motion also included the claim that the damages were excessive but this contention need not be considered because the defendant has now abandoned it. No exceptions were taken to any of the instructions given to the jury.

The facts, briefly stated, are as follows: The plaintiff, the administrator of the estate of his twenty-one year old deceased son, Bennett Lawrence Pate, is a resident and citizen of the Town of Corona, in the State of New Mexico. His son, prior to his death in November, 1949, had always lived with his father, mother, and sister in their home in New Mexico.

The defendant is a citizen of the State of Maine, residing at and doing business in the Town of Coopers Mills, Maine. He is the owner of a business known as the Howe Fur Company which he has operated over a period of many years. Among other things, he bought and sold old and obsolete cartridges and ammunition; purchased expended cartridge cases and reloading equipment; and sold reloaded, repacked and converted old and used cartridges and ammunition. He advertised his business in various trade journals, magazines and periodicals and furnished printed listings and catalogues which he sent to prospective customers upon request. A substantial part of his business was done by direct mail.

In response to an advertisement published by the defendant in the November 1947 issue of Popular Mechanics, the deceased, Ben Pate, wrote for and received shortly thereafter a catalogue and listings, by description, of various obsolete and foreign cartridges. No mention of any kind was made by the defendant in his advertisements, catalogues or listings of the name of the manufacturer of these articles. The following listing, by description, was among those received by the deceased: "100 reloads 7.7 m/m 31 O. P. Jap Army Full Chg."

Some months prior to December, 1948, Ben Pate received a gift of a 99 Ariska Model Jap rifle, known as a 7/7 Jap gun. The reloads, above-mentioned, were represented to be suitable ammunition for this type of Jap rifle. In the latter part of November, 1948, Ben Pate sent the following order which the defendant received on November 30, 1948: "Please send me the following ammunition for a 31 Cal Jap rifle 7/7 m/m. In your catalogue they are priced at $3.00 per box. I would like as many as three boxes at this price. Enclosed is a money order for $10.00. If shells are higher send me this amount."

On November 30, 1948, the defendant sent an acknowledgment of the order to Ben L. Pate, Box 239, Corona, New Mexico, as follows: "Thank you for your order of * * *. Due to the very heavy demand for 7.7 m/m Cal. cartridges we are temporarily out of stock. A new supply has been ordered and is now on its way. Just as soon as received balance of your order will follow. We appreciate very much your orders and will look forward with pleasure to serving you again when you are in the market for trappers, hunters, campers, fisherman, and other outdoor equipment. (Signed) Howe Fur Company, Coopers Mills, Maine."

On December 3, 1948, the defendant shipped via American Express the ammunition as ordered, and Ben Pate received it a few days later.

The evidence clearly establishes the fact that the defendant was familiar with reloaded ammunition and the manner of inspecting same. Evidence was also adduced at the trial tending to show that the shipment of ammunition sent by the defendant to Ben Pate was ammunition returned by some consignee for undisclosed reasons, to whom it had previously been sent by the defendant.

Shortly after this ammunition was received by the deceased, he fired eleven

rounds from his Jap rifle, and retained the empty shells with the intention of selling them to the defendant at a later date. Testimony was given by this plaintiff that each of these expended shells were sprung or bulged out on the sides. They were not offered in evidence at the trial.

On October 23, 1949, the deceased, Ben Pate, accompanied by his friend, Everett Yandell, left for the outskirts of Corona, New Mexico, by automobile, for the purpose of participating in target practice. Ben Pate brought with him his Jap rifle and, in the glove compartment of his automobile, the box of ammunition which he had received from the defendant. No ammunition, other than this, was available to either party. His friend, Yandell, brought with him a Jap rifle which had been sent to his father, Mr. Yandell, Sr., in 1945 by a relative who was then stationed in Japan. The guns were identical in all material respects, the only difference being in the stock of the Ben Pate gun which had been rebuilt by him. Upon arrival at their destination, a wooded area, they left the automobile and walked some distance in from the road in preparation for their target practice. Ben Pate took the Yandell gun and some shells with him, and Everett Yandell took the Ben Pate gun. Yandell inserted a shell given to him by Pate and successfully fired the Pate gun. Ben Pate inserted one of the cartridges in the Yandell gun and fired without anything unusual happening. Yandell fired a second round from the Pate gun without trouble. Ben Pate then inserted his second cartridge, the so-called "fatal shell", in the Yandell gun and fired from a kneeling position, with Yandell standing about three feet behind him. There was an explosion from the gun, different in sound from the other three shots. Yandell felt a burning sensation on the side of his face and, looking down, he saw blood flowing out of Ben Pate's forehead above his right eye. He then assisted Pate to the automobile, bringing the two guns with him. Yandell drove immediately to the office of Dr. Barry, two miles distant, left Ben Pate with the doctor, and drove off to get the father and mother of the deceased on orders of the doctor. He got the parents of his friend, Pate, and, with his own father accompanying them, they went to the doctor's office. Shortly after their arrival, Yandell, accompanied by his father, went outside of the doctor's office and took his gun, which Ben Pate had used from the automobile, examined it, and tried, without success, to open the breach. The bolt was frozen. Neither Mr. Pate, the plaintiff, nor Mr. Yandell, Sr., were able to open it. Later on, the gun was opened by a local gunsmith and the so-called fatal shell was taken from the gun, safely kept in its then condition, later offered as an exhibit in Court, and admitted without objection at the trial. The Yandell rifle, which had never been fired by anybody, after its receipt by Yandell, until it was fired by Ben Pate on October 23, 1949, together with a substantial number of other exhibits, including the ammunition sent to the deceased by the defendant, was offered and admitted without objection.

Ben Pate died fourteen days later on November 6, 1949, after having undergone an operation for the removal of five metal fragments of the "fatal shell" from his brain. It was stipulated that Ben Pate died as a result of the gunshot wound received on October 23, 1949.

The plaintiff made the following contentions:

(1) That the defendant was the manufacturer of the ammunition sent to the deceased, Ben Pate, and that it was defective and unfit for its intended use, and that this defective shell was the proximate cause of Ben Pate's injuries and death.

(2) That if the defendant was not actually the manufacturer of this ammunition, he held himself out as such through representations made by him in his advertisements, such as catalogues and other data, and that Ben Pate, or the ordinarily prudent person would be led to believe that the defendant was the manufacturer of the cartridges, and, therefore, should be held to that degree of care legally imposed on a manufacturer of dangerous instrumentalities such as ammunition and reloaded gun cartridges.

(3) That if the jury should find that the defendant was not the actual manufacturer,

and his conduct would not warrant a reasonably prudent man in believing he was the manufacturer, then he is to be considered a dealer, and, as such, would be held to that degree of care required of a reasonably prudent man engaged in the business of selling such dangerous articles as reloaded ammunition for guns.

The defendant contends that he was not the manufacturer and did not hold himself out as such, and says that the deceased was aware of this fact because he was put on notice before the shipment of the ammunition was made to him by the defendant. The defendant contends that the cartridges sold by him to the deceased were properly constructed and fit for their intended use.

The plaintiff contends that the shells sent to the deceased were defective and improperly constructed and not fit for their intended use, and that a proper inspection by the defendant, as a dealer, would have readily disclosed this to be the fact. He contends that the so-called "fatal shell" was abnormally short and that the base of the shell was corroded and abnormally weak and, as a result, the cartridge exploded and was the proximate cause of the injury resulting in the death of Ben Pate.

On the other hand, the defendant contends that the explosion and resulting injury was in no way due to a defect in the "fatal shell", but was the direct result of dangerously excessive head space in the breach on the Yandell rifle used by the deceased, and the absence of a metal bolt cover which properly belonged on the gun. He further contends that the deceased was guilty of contributory negligence in using and firing this Yandell rifle with such dangerous and excessive head space and that the proximate cause of the injuries complained of was the excessive head space in the Yandell rifle, and the failure of the deceased to have on the rifle, at the time it was fired, the cover, the purpose of which was to prevent the very injuries complained of by the plaintiff.

There is no special difference of opinion between counsel as to the rules of law governing the consideration and the decision of the motion presently before this Court,

nor could there well be in view of the fact that the law is well-settled.

For this Court to set aside the verdict, for the reasons alleged in the motion, there must be such a manifest weight of evidence against the verdict, as to render it clear that the jury either misapprehended the evidence, or were guilty of gross misconduct. Hewey v. Nourse, 54 Me. 256. It is not the province of the Court to weigh the evidence for the purpose of determining the preponderance of it between the parties; that is the province of the jury. When the evidence is conflicting, a verdict will not be disturbed if it is found to be supported by evidence, credible, reasonable, and consistent with the circumstances and probabilities of the case, even though it may seem to the Court that the evidence as a whole preponderates against the finding of the jury. Jannell v. Myers, 124 Me. 229, 127 A. 156.

The plaintiff produced two witnesses, admittedly experts, who testified with regard to both the gun and the ammunition in question. Mr. Leon Shepard, with 30 years' experience as a ballistics expert, testified that the reloaded ammunition sent to Ben Pate by defendant was not properly constructed for its intended use; he detailed his reasons for that conclusion, stating that the cartridges differed in length, the seating of the projectile was improperly done, the drilling of the points was wrong, and the shells did not fit with enough close tolerance in the gun itself. He also testified that the cartridges sent to the deceased by the defendant were 30-'06's, which never should have been fired in a Jap rifle. Mr. Shepard also testified he had examined the fatal gun minutely; that it was in perfect working condition; that it did not contain excessive head space, and that he would not hesitate to fire it with proper Jap ammunition, or with proper reloaded ammunition.

He also testified that his examination of the "fatal shell" revealed that it simply disintegrated at its base, and came back through the ejector channel or slot in the bolt, and part of the metal was thereby deposited under tremendous pressure and probably, in some instances, in a molten state. He further testified that in all his

experience he had never seen the metal cover on a Jap rifle, and that he did not know what the slots or grooves were for which were located on each side of the bolt between the wood and the metal. Actually, these grooves were placed there to receive the metal cover and hold it in place.

A second expert called by the plaintiff, Clarence E. B. Horton, testified that the cartridges sold to Ben Pate by the defendant were not as advertised; that they were not Jap army cartridges but American army cartridges, resized in an attempt to make them usable in a Jap rifle. He characterized them as the poorest handloads he had ever seen; that the shells were old, ranging in age from World War I up to 1942, or 1943, and were not safe to use. He testified that these shells, in appearance, were very poor; the necks were unevenly trimmed; the 30–'06 cases should never be used in a Jap gun chamber, and the bullets were battered. He stated he would not fire any of the ammunition sent by the defendant to Ben Pate because he considered it dangerous. He examined the Yandell gun and stated it did not have excessively dangerous head space.

Much testimony was adduced by the defendant in relation to what he termed a protective cover.

In the opinion of expert Horton the hood or cover was originally designed and used to exclude sand and dirt from the gun and was never intended to be used on the gun at the time of firing. He stated that, in his opinion, the force of the explosion from the "fatal shell" would have blown the cover off the gun and Ben Pate would have been injured thereby.

The defendant, likewise, called two expert witnesses whose testimony was, in most respects, in sharp conflict with the testimony offered by the plaintiff. Mr. Harry A. Crowley, a gunsmith, part time from 1925 until 1946, and full time since then, testified that the design of Jap guns were superior to American made weapons but in assembling them the tolerances allowed were excessive and that the metal cover was designed to take care of poor workmanship and to prevent flashbacks. He asserted that the tolerance in the Yandell, or fatal, gun was excessive and that the gun was poorly constructed and not complete when fired by the deceased, because it lacked the cover. He stated that he would not fire that gun even with a Japanese shell or a standard reload which he himself had made. He ascribed the cause of the explosion that caused the injuries to the deceased, Ben Pate, to a combination of poor and excessive head space, and possibly a defective case or shell. He also testified that the ammunition sold and sent by the defendant to the deceased, did not show the expert workmanship you would expect and that he reached this conclusion from just a glance at the outside of the case. He also testified that he had done work on about 200 Jap rifles and of that number about 25 were not equipped with covers. He further stated that he knew of Jap rifles fired with 7.7 ammunition without the cover. He also doubted very much if Ben Pate would have received the injuries he did receive if the cover had been on the gun when the "fatal shell" was fired. A second expert, Carl Morrison, called by the defendant, was in substantial accord with the opinion of Mr. Crowley.

Not much consideration need be given to the first two contentions of the plaintiff, that is, the claim that the defendant, because of representations made by him in his advertisements, catalogues and listings, should be regarded as a manufacturer, or that he held himself out as a manufacturer and was, therefore, legally bound to observe that high degree of care required of one engaged in the construction and manufacture of explosives. The deceased was put on notice that this defendant was a dealer and not a manufacturer. Neither could the jury have reasonably concluded that the defendant held himself out as a manufacturer in view of the information contained on the postal card sent to the deceased by the defendant on November 30, 1948, which was introduced in evidence by the plaintiff himself.

The defendant, however, admits he was a dealer. If he failed to make a reasonable inspection of that ammunition prior to sending it to Ben Pate, or if he made an examination in a negligent manner, and there was a defect in the shell which made

426

it dangerous for its intended use and which such reasonable inspection would have revealed, then the defendant was negligent; and if that defective condition was the sole proximate cause of the injuries suffered by Ben Pate, then this defendant, as a dealer, would be liable for that injury.

██ The burden of proof was upon the plaintiff to establish this contention. The shells were exhibits and the opportunity to carefully examine them was afforded to the jury; the testimony of the two experts called by the plaintiff was offered to establish the fact that this ammunition was not suitable for its intended use, but was defective in several respects; the testimony of witness Crowley, called by the defense, indicated that the ammunition did not show the expert workmanship one would expect. The evidence adduced at the trial, in the opinion of this Court, would amply warrant the conclusion by the jury that the ammunition sent by this defendant to Ben Pate was not suitable for its intended purpose and that the defendant failed to make a reasonable inspection of it prior to its shipment, or, if the defendant made any inspection at all, it was done in a negligent manner. An inspection of the so-called "fatal shell" indicates the corroded condition which must have been present and apparent upon inspection. It must have been, likewise, apparent to the jury that most of the other shells were defective in one or more respects.

The defendant testified that he received his last shipment of ammunition from the Blodgett Gun Company in 1948, on the 17th day of November; that he was temporarily out of this ammunition on November 30, 1948, as stated in his response in the order from the deceased, and the only thing he could say was " * * * it would be shipments that were returned from someone." No reason was assigned by the defendant for the return of this shipment to him. The jury might well have inferred that these reloaded shells were returned because of defects apparent to the consignee who sent the shells back to him.

██ We will next consider the question of contributory negligence on the part of the deceased. In view of the death of Ben Pate, the law presumes that the deceased was in the exercise of due care and free contributory negligence. It was the legal duty of the defendant to allege, as he did in his pleading, and to prove by a fair preponderance of the evidence, that the deceased was guilty of negligence which contributed to the injury resulting in his death.

Having in mind that the deceased was using a used foreign gun, the property of another, one which he had never used before, but aware also of the fact that he had a Jap rifle of the same make, size and construction, which he had safely used on a prior occasion, what precautions should he, as a reasonably prudent man have taken to ascertain the condition of this borrowed gun prior to firing it? Should he have discovered the defect, if any, in the head space, if that was, as claimed by this defendant, a contributing cause of the accident? Would Ben Pate, as a reasonably prudent man be expected to have knowledge of the bolt cover, having in mind that a man of thirty years' experience in the ballistics field, such as expert Shepard, had no knowledge of such a cover? Did he know, or should he have known, by the exercise of reasonable care, that the bolt cover was necessary for safety purposes, if the cover actually was intended for that purpose, and that its absence was a contributing cause of the accident? What was the actual condition of the so-called fatal gun with respect to its head space and operating condition?

The jury had before it, as exhibits, the fatal Yandell gun, the ammunition sent by the defendant to the deceased, the catalogue, advertisements, listings of the defendant, the so-called fatal shell, wax cases of the chamber of the Yandell gun, a cover —so-called—for use on a Jap rifle, and other exhibits material to the issues raised during the trial of this case.

It is apparent that the jury believed the claims of the plaintiff that this ammunition was not as represented by the defendant; that it was not suitable for its intended purpose; that it was improperly and poorly constructed, and that it was the proximate cause of the injury and death of Ben Pate.

It is equally clear that the jury likewise accepted the views of the plaintiff's witnesses after an examination of the gun and other exhibits admitted by agreement during the trial of the case.

In the opinion of this Court, the verdict was arrived at after a careful trial, with able counsel participating, with no apparent errors and with instructions to the jury to which no exceptions were taken. There is no reason to think that the jury failed to exercise a deliberate and unbiased judgment or that it was influenced by any prejudice. The jury, after apparently adequate instructions, including the rule as to burden of proof, adopted the view of the facts as testified to by the witnesses for the plaintiff. For these reasons a new trial will not be granted since to do so would amount to a substitution of the judgment of the Court for that of the jury.

It is therefore ordered, that the defendant's motion to set aside the verdict and grant a new trial, be, and hereby is denied.